**2015-1361, -1366, -1368, -1369**

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

PPC BROADBAND, INC.

*Appellant,*

v.

CORNING OPTICAL COMMUNICATIONS RF LLC,

*Appellee.*

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, Case Nos. IPR2013-00340, IPR2013-00345,
IPR2013-00346, and IPR2013-00347

---

## BRIEF OF APPELLEE

---

Todd R. Walters, Esq.
S. Lloyd Smith, Esq.
Roger H. Lee, Esq.
BUCHANAN INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 836-6620

*Counsel for Appellee*
*Corning Optical Communications RF LLC*

August 10, 2015

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee certifies the following:

1.　　The full name of every party or amicus represented by me is:

　　Corning Optical Communications RF LLC.

2　　The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

　　The party in the official caption is the real party in interest.

3.　　All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

　　Corning Optical Communications RF LLC is a wholly owned subsidiary of Corning Oak Holding, LLC, which is a wholly owned subsidiary of Corning Incorporated, which itself is a publicly traded company.

4.　　The names of all law firms and the partners or associates who appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

　　Todd R. Walters, Roger H. Lee, and S. Lloyd Smith of Buchanan Ingersoll & Rooney PC.


August 10, 2015　　　　　　　　/s/ Todd R. Walters
　　　　　　　　　　　　　　　Todd R. Walters, Esq.
　　　　　　　　　　　　　　　*Counsel for Appellee*
　　　　　　　　　　　　　　　*Corning Optical Communications RF LLC*

# **TABLE OF CONTENTS**

Page(s)

I.  STATEMENT OF RELATED CASES ........................................................1

II. STATEMENT OF THE ISSUES .............................................................2

III. STATEMENT OF THE CASE ................................................................4

IV. STATEMENT OF THE FACTS ..............................................................6

    A.  Technical Background ..............................................................6

    B.  The '320 Patent Family ............................................................7

        1.  The Continuity Member of the '320 Patent Family ..................7

        2.  The Specification Describes an Embodiment in which the
            Continuity Member is Sandwiched Between the Body
            and Post......................................................................9

        3.  The Specification Describes Embodiments in which the
            Continuity Member is Not Sandwiched and Contacts the
            Post Only via a Radially Inner Edge ...........................9

        4.  The Disputed Claim Limitations of the '320, '060, and
            '353 Patents...............................................................11

    C.  The Prior Art .......................................................................12

        1.  Matthews..................................................................12

        2.  Tatsuzuki..................................................................15

    D.  The Board's Decisions ...........................................................18

        1.  The Claim Construction Adopted by the Board ......................18

        2.  The Board's Findings on Obviousness.................................20

        3.  Secondary Considerations ..............................................25

        4.  On Appeal, PPC Limits Its Arguments to the Board's
            Findings on the First Embodiment ...........................25

i

# TABLE OF CONTENTS
## (continued)

V.      STANDARD OF REVIEW ..........................................................................26

VI.     SUMMARY OF ARGUMENT ..................................................................28

VII.    ARGUMENT ...............................................................................................30

A.      PPC Does Not Contest that the Second (Sandwiching)
Embodiment Satisfies the Disputed Claim Limitations ......................30

B.      The Board Properly Construed Limitations which Include the
Terms "continuity member" and "electrical continuity member" ......33

1.      The Board's Construction of the "continuity member"
and "electrical continuity member" Limitations is
Consistent with the Specification ............................................33

2.      As a Structural Component, the Continuity Member
Maintains the Ground Path by Extending the Ground
Path Between the Components to which It is Connected.........35

3.      The Board Did Not Overlook or Ignore "maintain".................36

4.      PPC's Own Extrinsic Evidence Supports the Board's
Construction............................................................................37

5.      The Term "continuous" Means an Unbroken Ground
Path .........................................................................................38

C.      PPC's Proposed Construction is Not the Broadest Reasonable
Interpretation ......................................................................................40

1.      PPC's Construction Renders the Claims Indefinite.................41

2.      PPC's Attempt to Import "consistent contact" and
"continuous electrical connection" from the Specification
into the Claims is Improper .....................................................42

3.      PPC's Construction is Inconsistent with the Prosecution
History of the '320 Patent Family ............................................45

4.      PPC's Allegations Concerning "electrical continuity" and
"electrical connection" are Untenable .....................................46

ii

# TABLE OF CONTENTS
## (continued)

D.    The Board Properly Construed "shaped to fit" and "configured to fit"................................................................................47

    1.    The Ordinary Meaning of "configured to fit" and "shaped to fit," and the '320 Patent Family Specification Do Not Require Opposing Complementary Surfaces ..............47

    2.    The Usage of "fit" in the '320 Patent Family Does Not Exclude Perpendicular Surfaces ...............................................49

    3.   The Construction of "configured to fit" and "shaped to fit" Does Not Render the Claimed Invention Inoperable ..............50

E.    The Board's Findings of Obviousness Should Not Be Reversed .......51

    1.    Even Under PPC's Construction, the Claimed "continuity member" and "electrical continuity member" Limitations are Obvious in View of Matthews and Tatsuzuki ...................51

    2.    PPC's Arguments Against the References are Not Supportable ................................................................................54

    3.    "Configured to Fit" or "Shaped to Fit" are Obvious ...............59

F.    Substantial Evidence Supports the Board's Conclusions on Secondary Considerations ...................................................................61

    1.    The Board Relied on Substantial Evidence in Reaching Its Secondary Considerations Findings ...................................62

    2.    Long-felt But Unsolved Need...................................................62

    3.    Alleged Failure of Others ........................................................63

    4.    Alleged Copying by Corning....................................................64

    5.    The Board's Findings on Commercial Success are Supported by Substantial Evidence and Not Inconsistent with Its Qualified Findings Regarding Alleged Copying.........67

    6.    PPC's Improper Claim Constructions Do Not "Save" Its Secondary Considerations Arguments....................................70

## TABLE OF CONTENTS
### (continued)

VIII.  CONCLUSION..............................................................................................70

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Agfa Corp. v. Creo Prods., Inc.*,
   451 F.3d 1366 (Fed. Cir. 2006) ...........................................................27

*Alco Standard Corp. v. Tennesee Valley Auth.*,
   808 F.2d 1490 (Fed. Cir. 1986) .........................................................63

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) .........................................................27

*In re Baxter Int'l, Inc.*,
   678 F.3d 1357 (Fed. Cir. 2012) .........................................................27

*Cable Elec. Prods. Inc. v. Genmark Inc.*
   770 F.2d 1015 (Fed. Cir. 1985) ...................................................67, 69

*In re Cortright*,
   165 F.3d 1353 (Fed. Cir. 1999) .........................................................40

*In re Cuozzo Speed Techs., LLC*,
   778 F.3d 1271 (Fed. Cir. 2015) .........................................................26

*Ecolochem, Inc. v. S. California Edison Co.*,
   227 F.3d 1361 (Fed. Cir. 2000) .........................................................69

*In re Fulton*,
   391 F.3d 1195 (Fed. Cir. 2004) .........................................................59

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) .........................................................27

*In re Huang*,
   100 F.3d 135 (Fed. Cir. 1996) ...........................................................69

*K/S Himpp v. Hear-Wear Techs.*,
   LLC, 751 F.3d 1362 (Fed. Cir. 2014)............................................26, 61

v

# TABLE OF AUTHORITIES
## (continued)

*In re Keller*,
  642 F.2d 413 (CCPA 1981) ................................................................55

*KSR Int'l Co. v. Teleflex Inc*,
  550 U.S. 398 (2007).......................................................................23

*In re Merck & Co., Inc.*,
  800 F.2d 1091 (Fed. Cir. 1986) .........................................................55

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) .........................................................26

*In re Paulsen*,
  30 F.3d 1475 (Fed. Cir. 1994) ......................................................26,27

*Praxair, Inc. v. ATMI, Inc.*,
  543 F.3d 1306 (Fed. Cir. 2008) .........................................................37

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010) ......................................................37,40

*Superguide Corp. v. DirecTV Enterprises, Inc.*,
  358 F.3d 870 (Fed. Cir. 2004) ...........................................................43

*Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015).....................................................................26

*Therasense, Inc. v. Becton, Dickinson and Co.*,
  593 F.3d 1289 (Fed. Cir. 2010), *aff'd in relevant part, overruled on other grounds*, 649 F.3d 1276 (Fed. Cir. 2011)..................................68

*Wyers v. Master Lock*,
  616 F.3d 1231 (Fed. Cir. 2010) .........................................................64

**Statutes**

35 U.S.C. § 103 ..........................................................................5, 27, 28

**Rules**

Federal Circuit Rule 47.5 ..................................................................1

vi

## I.     STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellee Corning Optical Communications RF LLC ("Corning") state that an appeal to this Court in a related proceeding, Appeal No. 2015-1364, has been filed by Appellant.  No other appeal from this action or related actions has previously been before this or any other appellate Court.

Counsel for Appellee further states that there are no other cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## II.    STATEMENT OF THE ISSUES

1.    Whether PPC's entire appeal is moot because PPC's appeal concerns only the first embodiment of the prior art combination and ignores the second embodiment, which the Board found renders the claims at issue obvious and which discloses the claim limitations disputed by PPC even under PPC's claim construction?

2.    Whether the Board's construction of the meaning of the "continuity member" and "electrical continuity member" limitations according to their plain and ordinary meaning under the broadest reasonable construction standard was correct?

3.    Whether the Board's construction of the meaning of "shaped to fit" and "configured to fit," according to their plain and ordinary meaning under the broadest reasonable construction standard, should be overturned in favor of PPC's indefinite construction that is not supported by either the specification or plain English?

4.    Whether the Board properly concluded that claims 1-32 of the '320 patent, claims 7-27 of the '353 patent, and claims 1-9 of the '060 patent are obvious based on well-known solutions previously disclosed in the prior art?

5.    Whether PPC has met its high burden to show that the Board's conclusions on secondary considerations based on extensive evidence are not supported by substantial evidence?

## III.   STATEMENT OF THE CASE

This appeal concerns Appellant PPC Broadband, Inc.'s ("PPC") U.S. Patent Nos. 8,323,060 ("the '060 patent"), 8,313,353 ("the '353 patent"), and 8,287,320 ("the '320 patent"), all entitled "Coaxial Cable Connector Having Electrical Continuity Member."  All three patents have the same specification.  The '353 patent and '060 patent are continuations of the '320 patent, and all three patents are referred to collectively herein as "the '320 Patent Family."

The coaxial cable connector of the '320 Patent Family concerns a cable connector used for television set-top boxes and other common electronics, and represents an attempt to provide a ground connection even if the "nut" or threaded front portion of the connector is not properly tightened.  This ground connection is achieved by using a continuity member which is a conductive component, to facilitate an internal conductive path within the connector.  Use of such continuity members was well-known in the prior art and disclosed in references such as Tatsuzuki (Japanese Application Publication No. 2002-015823), and Matthews (U.S. Application Publication No. 2006/0110977).

Appellee, Corning, filed several petitions for *inter partes* review of claims 1-32 of the '320 patent, claims 7-27 of the '353 patent, and claims 1-9 of the '060 patent.  The Board instituted the related IPR proceedings at issue in this appeal (*i.e.,* IPR2013-000340, IPR2013-00345, IPR2013-00346, and IPR2013-00347) on the

grounds that the challenged claims of the '320 Patent Family are unpatentable under 35 U.S.C. § 103(a) over the combination of Matthews and Tatsuzuki.[1]

After a consolidated oral hearing, the Board determined in all four of the related proceedings that Corning demonstrated that claims 1-9 of the '060 patent, claims 7-27 of the '353 patent, and claims 1-32 of the '320 patent are unpatentable under 35 U.S.C. § 103(a) over the combination of Matthews and Tatsuzuki.  A54; A143; A194; A238.

In reaching its determination of the obviousness of the claims at issue, the Board considered several possible embodiments combining the teachings of Matthews and Tatsuzuki, as proposed by Corning's expert.  Among these embodiments are a first, press-fit embodiment and a second, sandwiching embodiment, as discussed in detail below.  On appeal, PPC does not allege that the second embodiment is missing any claim limitations, even under PPC's own proposed claim construction.

---

[1] The Board entered a Decision finding that claims 10-25 of the '060 patent are unpatentable over the combination of Matthews and Tatsuzuki in IPR2013-00342. This decision is under appeal in Appeal No. 2015-1364.

## IV.    STATEMENT OF THE FACTS

### A.    Technical Background

A coaxial cable has a central electrical conductor, surrounded by an insulating layer and one or more outer electrical conductors. Coaxial cable has many uses, but a very common one today is to connect TVs, set-top boxes, computers, DVD players, and the like to satellite dishes, cable TV distribution lines, and the like. A1200.

In a coaxial cable, the inner conductor and the outer conductor carry electrical signals in analog or digital form. It is customary to call the inner conductor the "signal feed" (or "signal") and the outer conductor, the "ground return" (or "ground"). A1201. To connect a coaxial cable to a device, such as a DVD player, mating connectors are used. The inner conductor of the coaxial cable connector must be connected securely (mechanically and electrically) to a central pin receptacle on the device connector while the outer conductor must be electrically connected to the ground of the device. *Id.* To attach a connector to the coaxial cable, the center conductor, insulating layer, and foil typically are inserted into a central post in the connector, while the outer braid is captured in a bore about the post. *Id.*

Poor electrical connections on either the signal or ground portion of the connectors can result in radio frequency leakage and can cause the operation of the

device connected to the cable to be noisy or non-functional. Sometimes, threaded portions of connectors are not properly tightened, or a proper connection does not occur for other reasons, with the result that shielding is lost or inadequate. A1201-02. The '320 Patent Family discloses a coaxial cable connector that is designed to facilitate the extension of an electrical ground path between a coaxial cable and an interface port to which the connector is attached, using a continuity member. *See, e.g.,* A476[2] at 1:14-18.

### B.    The '320 Patent Family

#### 1.    The Continuity Member of the '320 Patent Family

According to the specification, the "continuity member" or "electrical continuity member" is a structural component of the connector that facilitates the extension of an electromagnetic interference shield (*i.e.*, a ground path) from the cable and through the connector to an appliance (interface) port. A476 at 1:16-18.

As illustrated in the annotated excerpt of FIG. 20 below, the specification describes that the continuity member 70 is one of several components of the connector which collectively serve to maintain (*i.e.*, extend) an electrical ground path from the interface port 20 to the outer conductive grounding shield 14 of the

---

[2] Citations to the '320 patent should be understood to also refer to portions of the '060 and '353 patents with identical content.

cable.  The specification provides that the "ground path *extends from* the interface port 20 to the nut 30, *to the continuity member 70*, to the post 40, to the conductive ground shield 14."  A482 at 14:20-30 (emphases added).



**Annotated Excerpt of FIG. 20 (A442)**

The above annotation of FIG. 20 includes a dotted line indicating that the post 40 is inserted into an end of the prepared cable "under the drawn back conductive grounding shield 14" to be in physical and electrical contact with the conductive grounding shield 14 to "facilitat[e] grounding through the post 40." A479 at 8:49-51; A483 at 16:11-17; *see also* A452 (FIG. 30 illustrating the post inserted under the conductive grounding shield 14).

### 2.    The Specification Describes an Embodiment in which the Continuity Member is Sandwiched Between the Body and Post

The specification describes multiple types of continuity members encompassed by PPC's purported invention.  In one embodiment illustrated in FIG. 17, the continuity member 570 contacts the nut 30, post 40, and body 50, wherein the continuity member 570 is sandwiched between the post 40 and body 50.  A477 at 3:40-43.  The continuity member 570 contacts the nut 30 rearward of the internal lip of the nut 30.  A482 at 13:47-57.



**Annotated Excerpt of FIG. 17 (A439)**

### 3.    The Specification Describes Embodiments in which the Continuity Member is Not Sandwiched and Contacts the Post Only via a Radially Inner Edge

In another embodiment illustrated in FIG. 19, the continuity member 670 is arranged to be in contact with the nut 30, post 40, and body 50 (*e.g.*, by press-

fitting).  A480 at 9:18-24; A485 at 20:28-32.  In the embodiment of FIG. 19, the

continuity member 670 includes a post contact portion that resides radially

between the internal lip 34 of the nut 30 and the post 40, such that continuity

member 670 contacts the post 40 only via a radially inner edge of the continuity

member.  A482 at 14:8-12.



**Annotated Excerpt of FIG. 19 (A441)**

The specification discloses a further embodiment in which the thin

continuity member 570 (shown below), rather than being sandwiched between the

body and post as shown in FIG. 17, contacts the post 40 ***only*** via radially inner

edge 577 of the continuity member 570.  A482 at 14:6-8.



**Annotated FIG. 16 (A438)**

Thus, the specification discloses a continuity member sandwiched between the post and body as well as continuity members which contact the post only via a radially inner edge (*e.g.*, by press-fitting).

### 4.    The Disputed Claim Limitations of the '320, '060, and '353 Patents

The Board construed claim limitations relating to a "continuity member" and "electrical continuity member" as recited in claims 1, 9, 10, 17, 18, and 32 of the '320 patent.  A153-56; A204-07.  The Board's construction of these claim limitations is disputed by PPC on appeal.  The Board construed the limitation "shaped to fit" as recited in claim 28 of the '320 patent, which PPC also disputes. A156-59.

The Board construed claim limitations relating to a "continuity member" as recited in claim 1 of the '060 patent.  A8-10.  The Board's construction of these

11

limitations is disputed by PPC on appeal. The Board construed the limitation "configured to fit" as recited in claim 1 of the '060 patent, which PPC also disputes. A11-13.

The Board construed claim limitations relating to an "electrical continuity member" as recited in claims 7 and 20 of the '353 patent, which are disputed by PPC on appeal. A99-102. The Board construed the limitation "shaped to fit" as recited in claims 16 and 24 of the '353 patent, which PPC also disputes. A102-05.

### C.    The Prior Art

The use of a continuity member in a coaxial cable connector is a well-known idea, as disclosed in Matthews and Tatsuzuki.

#### 1.    Matthews

Matthews, U.S. Patent Application Publication No. 2006/0110977, describes a connector 100 that includes at least one conductive member so that improved reliability may be achieved. A1083 at ¶¶ 2, 7. As illustrated in the annotated version of FIG. 1 of Matthews below, the connector 100 includes, in combination with other features, a threaded nut 30, a post 40, a connector body 50, and a mating edge conductive member 70 and/or a connector body conductive member 80. A1084-85 at ¶ 28; A1077; A1081; A1082.



**Annotated FIG. 1 of Matthews (A1077)**

Like the '320 Patent Family, the post 40 of Matthews is inserted into a prepared end of the cable 10 to be in electrical contact with the conductive grounding shield 14 of the cable 10 to facilitate grounding through the post 40. A1084-85 at ¶¶ 26, 31. Both conductive members 70 and 80 are arranged in a manner that provides physical and electrical seals for different components of the connector. For example, conductive member 80, when present, effectuates an unbroken electrical circuit between the connector body 50 and the threaded nut 30, thereby grounding the connector 100. *Id.* at ¶ 28; *see also* A1081 at FIG. 7. The conductive member 70, when present, helps ground the connector 100 by physically and electrically contacting the interface port 20 and the post 40. A1087-88 at ¶ 40; *see also* A1082 at FIG. 8. Both conductive members 70, 80 are located so that they contact their respective connector components, the threaded nut 30, post 40, and/or connector body 50. A1085-88 at ¶¶ 28, 40.

13

As illustrated in the annotated version of FIG. 7 below, Matthews discloses an embodiment in which the connector includes conductive member 70 but not conductive member 80.  A1086 at ¶ 34.



**Annotated FIG. 7 of Matthews (A1081)**

As illustrated in the annotated version of FIG. 8 of Matthews below, Matthews discloses an embodiment in which the connector includes conductive member 80 but not conductive member 70.  A1086-87 at ¶ 35.



**Annotated FIG. 8 of Matthews (A1082)**

14

In at least one embodiment shown in FIG. 6, Matthews contemplates an integral connector body 90 that "physically and functionally integrates" the connector body 50 and the post 40.  A1086 at ¶ 33; *see also* A1080 at FIG. 6.

### 2.    Tatsuzuki

Tatsuzuki, Japanese Application Publication 2002-015823,[3] describes a coaxial plug 1 which includes a disc-shaped spring (continuity member) 13 that contacts a plug body (integral body and post) 11 and a rotary mounting element (nut) 12 so that an electrical connection between the plug body 11 and the rotary mounting element 12 exists.  A1024 at Abstract.  Tatsuzuki addresses a problem with traditional connectors where the connection between the plug body 11 and the rotary mounting element 12 is incomplete due to gaps between various components of the coaxial plug.  A1026 at ¶ 5.  When the disc-shaped spring 13 is included in the coaxial plug 1, the electrical connection continues even if the rotary mounting element 12 is loosened.  A1027-28 at ¶¶ 11, 20.

---

[3] The subject matter relied upon in IPR2013-00340, 00345, -00346 and -00347 including the figures exists in both the Certified English Translation of Tatsuzuki (A1024-75) and the Certified English Translation of Japanese Publication No. 4503793 ("JP '793") (A1000-23).  Appellee and the Board relied on images of the drawings from JP '793 due to their improved clarity.



**Annotated FIG. 3 of Tatsuzuki (A1035)**

The disc-shaped spring 13 is a metal plate that has elasticity and that also includes spring pieces 13b which are bent out of the plane of the ring-shaped joining part 13a.  A1027-28 at ¶¶ 17, 20; *see also* A1011 at FIGS. 7a, 7b.  An annotated excerpt of FIG. 3 of Tatsuzuki is provided below showing the specific placement of the disc-shaped spring 13 in contact with axial and radial surfaces of the plug body 11.  Similar to FIG. 6 of Matthews, the plug body 11 of Tatsuzuki is an integral component that includes portions corresponding to the body and post of the '320 Patent Family.



**Annotated Excerpt of FIG. 3 of Tatsuzuki (A1010)**

Tatsuzuki's disc-shaped spring 13 is illustrated below:



**FIGS. 7a, 7b of Tatsuzuki (A1011)**

These components disclosed by Tatsuzuki, in combination with other features, allow the Tatsuzuki coaxial plug 1 to be grounded without requiring an additional structure along the forward portion of the coaxial plug 1 that makes contact with the coaxial connector 50 that is located either on the appliance or in a fixed location such as a wall.  A1028 at ¶ 19.

17

**D.    The Board's Decisions**

**1.    The Claim Construction Adopted by the Board**

The Board construed the "continuity member" and "electrical continuity member" limitations, "configured to fit," and "shaped to fit."

**a.    The Continuity Member Limitations**

Due to the lack of a special definition in the '320 Patent Family specification, the Board declined to import PPC's proposed limitations that would require the "continuity member" or "electrical continuity member" to make "consistent contact" with the coupler/nut and the post such that it maintains a "continuous electrical connection" between the coupler/nut and the post.  A154-56; A170.  PPC advocated for these limitations based on various portions of the specification of the '320 Patent Family, a dictionary definition of "continuity," and the testimony of its expert witness, Dr. Charles A Eldering.  *Id.*

The Board agreed with Corning's position that it was improper to import limitations from the specification, and that the term "continuity" does not require an undefined level of consistency, reliability, or robustness of the electrical between the coupler/nut and post connection over an undefined period of time. A155.

The Board found that "continuity member" was not defined in the '320 Patent Family's specification.  *Id.*  The Board emphasized that the claimed

continuity member does not cease being a continuity member simply because the contact between the nut and the post "may not be 'consistent' to maintain a 'continuous electrical connection' between these components." *Id.* The Board also determined that PPC's dictionary definition does not require PPC's proposed construction. A9; A100-01; A154-55; A205-06.

The Board also agreed that there was no guidance for making an objective determination as to how long a continuity member must make "consistent contact" to maintain the proposed "continuous electrical connection" limitation between components. A155-56. Accordingly, applying the broadest reasonable construction standard, the Board found that the disputed claim limitations including the terms "continuity member" and "electrical continuity member" require that "the continuity member makes contact with the nut and the post to establish an electrical connection between the nut and the post." A156; *see also* A10; A102; A207.

### b.     The Configured/Shaped to Fit Limitations

For the terms "configured to fit" (claim 1 of the '060 patent), and "shaped to fit" (claims 16 and 24 of the '353 patent and claim 28 of the '320 patent), PPC advocated a construction requiring one surface having "a complementary size and shape as, and faces" another surface. A11-12; A102-03; A156-57; *see also* A1829-32; A1836-42. PPC also referred to a dictionary definition of "fit" as

19

meaning "proper size and shape for." *Id.* During oral argument, PPC elaborated that its proposed construction excludes strictly perpendicular surfaces, but would not require perfectly parallel surfaces. A11-13; A102-05; A156-59. PPC was unable to cogently explain, however, what variation from parallel would still encompass the claim terms. *Id.*

Corning argued the claim terms encompassed *both* perpendicular surfaces that abut each other and parallel surfaces that face each other. *Id.* Both PPC and Corning's experts agreed that surfaces that are configured to fit or shaped to fit each other "need to be dimensioned to abut each other." *Id.* The Board noted the parties' disagreement was to what extent surfaces appropriately sized and dimensioned to abut must be recognized as facing each other. *Id.*

The Board noted that such claim terms were not used in the specification outside of the claims. *Id.* The Board explained that surfaces that abut and touch, even if arranged at a 90-degree angle, are in a configuration "in which the faces of the surfaces are exposed to one another." *Id.* On the totality of the record, the Board concluded that the terms "configured to fit" and "shaped to fit" did not exclude an arrangement of components that are situated perpendicularly with respect to one another. *Id.*

### 2.    The Board's Findings on Obviousness

Under this construction, the Board extensively reviewed the evidence

submitted by both parties and found that a person of ordinary skill in the art, after considering the combination of the prior art, "would have appreciated that Tatsuzuki's continuity member 13 may be arranged in Matthews's connector 100 so as to form a continuity member positioned in the manner required by the claims." A122; *see also* A26-27; A33-34; A175-76; A222.

In reaching its obviousness determination, the Board considered two approaches explained by Corning's expert, from the perspective of one of ordinary skill in the art: (1) the press-fit or first embodiment, and (2) the sandwiching or second embodiment. Annotated illustrations of these two embodiments are reproduced below.






**Annotated Ex. 2007 Depicting the First Embodiment (A2993)**

**Annotated Ex. 1034 Depicting the Second Embodiment (A2995)**

*The First (Press-fit) Embodiment:* The Board concluded that the first or press-fit embodiment "conveys a continuity member positioned to contact a

rearward surface of the nut and extend between the post and connector body.
Tatsuzuki's continuity member, when positioned in the manner depicted, would
extend between, and facilitate electrical connection among, surfaces of the nut,
post, and body, as is required by the claims."  A173; *see also* A26-27; A119;
A219-20.

    *The Second (Sandwiching) Embodiment:*  With respect to the second or
sandwiching embodiment, the Board rejected PPC's argument that the Board's
obviousness analysis should be expressly limited to "only the approach presented
in the [first, press-fit embodiment] reproduced above in combining the teachings of
the prior art, without recourse to any other assessment of the skill of a person of
ordinary skill's viewpoint in so combining the teachings."  A174.  The Board noted
that "the evidence of record reflects that a person of ordinary skill in the art knew
of ordinary techniques for positioning a continuity member between a body and a
post of a coaxial connector."  *Id.*  For instance, the Board referred to the testimony
of PPC's expert, Dr. Eldering, who admitted that the technique of sandwiching a
continuity member between the body and the post was known in the art, as
evidenced by U.S. Patent No. 7,114,990 to Bence et al. ("the Bence patent") *Id.*;
A2653 at ll. 10-21 ("the continuity member is sandwiched between body 108 and
tubular post").  The annotated excerpt of FIG. 6A of the Bence patent below

depicts the well-known teaching of sandwiching a continuity member between the body and post of a coaxial cable connector.



**Annotated Excerpt of FIG. 6A of Bence (A2949)**

The Board indicated that "[t]here also is a finite number of identified, predictable solutions, *i.e.*, the Bence patent, Matthews, and Tatsuzuki provide evidence that one of ordinary skill in the art would have known that there is not a sole position or location recognized for positioning a continuity member in a coaxial cable connector; however, there are a limited number of possible positions for such a continuity member." A175; *see also KSR Int'l Co. v. Teleflex Inc*, 550 U.S. 398, 421 (2007).

Thus, the Board concluded that one skilled in the art would have had reason to pursue known options, including the sandwiching technique illustrated in the second embodiment above, "when contemplating where, and how, to position Tatsuzuki's continuity member 13 in Matthews's connector 100." *Id*. The Board concluded that one of ordinary skill would have appreciated how to arrange a continuity member to achieve the continuity member limitations of the claims. A175-76.

23

In addition, the Board concluded that components or surfaces that are "shaped to fit" or "configured to fit" one another are sized and dimensioned to abut one another, and that this meaning does not exclude perpendicularly arranged components.  A159; *see also* A13.  The Board held that Matthews's post 40 and connector body 50 are "shaped to fit" or "configured to fit" one another, as shown, for instance, in the annotated excerpt of Matthews's FIG. 1 below.  A177; *see also* A30.



**Annotated Excerpt of FIG. 1 of Matthews (A1077)**

For the "configured to fit" and "shaped to fit" limitations, the Board considered the press-fit and sandwiching embodiments for combining the continuity member disclosed in Tatsuzuki into Matthews.  Illustrations of these sketches are reproduced below.

24



| Exhibit 2005 continuity post engaging surface (horizontal/axial) | Exhibit 2006 continuity body engaging surface (vertical/radial) | Exhibit 2003 at 2 Exhibit 2013 at 47, 50, 57 |
|---|---|---|

A29; A124; A177.  The Board found that "adjoining and abutting horizontal and vertical surfaces of the post and body" are "configured to fit" and "shaped to fit" each other.  A125; A178; *see also* A30.

### 3.    Secondary Considerations

The Board extensively reviewed the evidence by both parties and substantially supported its findings on each separate secondary consideration.  A179-90.  The Board was not persuaded by PPC's purported evidence of secondary considerations.  A189-90.

### 4.    On Appeal, PPC Limits Its Arguments to the Board's Findings on the First Embodiment

PPC's arguments on appeal concerning claim construction and alleged missing limitations are limited to the first, press-fit embodiment above.  PPC does not allege the second, sandwiching embodiment above is missing claim limitations even under its proposed claim constructions.  PPC does not contest that the

sandwiching embodiment (1) achieves a "continuity member" or "electrical

continuity member" which has "consistent contact with the nut and the post to

maintain a continuous electrical connection between the nut and the post," "all of

the time," and "at all times during operation" (Brief of Appellant PPC Broadband

Inc.[4] at 23-30) and (2) provides post and body surfaces which have "a

complementary size and shape, and face[]" each other.  Brief at 30-35.

## V.    STANDARD OF REVIEW

When reviewing claim construction issues, this Court reviews the ultimate

claim constructions *de novo* and any underlying factual determinations involving

extrinsic evidence for substantial evidence.  *Microsoft Corp. v. Proxyconn, Inc.,*

789 F.3d 1292, 1297 (Fed. Cir. 2015) (*citing Teva Pharms. U.S.A., Inc. v. Sandoz,*

*Inc.*, 135 S. Ct. 831, 841-42 (2015)).  A factual finding is supported by substantial

evidence if a reasonable mind might accept the evidence to support the finding.

*K/S Himpp v. Hear-Wear Techs.,* LLC, 751 F.3d 1362, 1364 (Fed. Cir. 2014).

In *inter partes* review proceedings before the U.S. Patent and Trademark

Office, the broadest reasonable interpretation standard controls claim construction.

*See In re Cuozzo Speed Techs., LLC,* 778 F.3d 1271, 1281-82 (Fed. Cir. 2015).

The words of the claim are generally given their ordinary and customary meanings

---

[4] Brief of Appellant PPC Broadband Inc. hereinafter "Brief."

unless the inventor has acted as their own lexicographer. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). When intrinsic evidence does not provide a meaning for claim language, extrinsic evidence may be considered to determine how one of ordinary skill in the art would understand the ordinary and customary meaning of the claim term in the context of the entire disclosure. *See Teva*, 135 S. Ct. at 841. Intrinsic evidence of the patent includes the claims, the specification, along with the drawings and the patent's prosecution history. *Id.* General purpose dictionaries are a form of extrinsic evidence and may be used to ascertain meanings when the terms are commonly understood words. *See Agfa Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006).

Whether a claimed invention is unpatentable as obvious under 35 U.S.C. § 103 is a question of law based on underlying findings of fact. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). This Court reviews the Board's determination of obviousness *de novo* and the Board's factual findings for substantial evidence. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012). The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact. *Gartside*, 203 F.3d at 1316. The determination of what a reference teaches is a question of fact. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012).

## VI.    SUMMARY OF ARGUMENT

Contrary to the impression PPC tries to create, the '320 Patent Family did not invent the idea of continuity in a connector or the use of a continuity member. The use of a continuity member in a coaxial cable connector was old, as shown in the prior art.  PPC's characterization of an alleged novel feature of the '320 Patent family – the location of the continuity member behind the lip of the nut – was in fact old and well-known as demonstrated by Tatsuzuki.  Hence, the Board properly found that the claims at issue in this appeal are obvious and invalid under 35 U.S.C. § 103(a).

PPC's arguments concerning claim construction and alleged missing limitations address only the first, press-fit embodiment of the combination of prior art.  PPC does not contest that the second, sandwiching embodiment achieves both the continuity member and shaped/configured to fit limitations even under PPC's proposed constructions.  ***This Court can affirm the Board on this basis alone without any need to address the proposed construction and alleged missing claim limitations raised by PPC on appeal.***

The Board correctly determined that, under the broadest reasonable construction standard, the "continuity member" and "electrical continuity member" limitations require that "the continuity member makes contact with the nut and the post to establish an electrical connection between the nut and the post."  The

28

claims do not require PPC's proposed limitations that would require "consistent contact with the nut and the post to maintain a continuous electrical connection between the nut and the post." PPC's own extrinsic evidence supports the Board's construction.

PPC's proposed construction improperly imports limitations from the specification, and would require undefined and indefinite time, quality, and reliability limitations that are not in the claims or even the specification. The claimed continuity member remains a continuity member regardless of whether it performs its function at some undefined performance level or for some undefined period of time. PPC never clearly explained the level of reliability or robustness that is required by "consistent contact." PPC's proposed construction also contradicts the prosecution history.

PPC admits, as defined by PPC's dictionary definition, that "fit" means the proper size and shape. No definition offered by PPC requires that these surfaces must also face each other, and PPC fails to explain why surfaces that "fit" each other must necessarily face each other. PPC is also unable to specify what degree of divergence from parallel surfaces means that the surfaces are no longer shaped or configured to fit. PPC's own expert testified that perpendicularly arranged surfaces, such as the body and post surfaces in Matthews, are "shaped to fit" each other.

Because the Board's claim constructions cited above are correct, and PPC's non-obviousness arguments would require this Court to overturn those constructions, PPC's arguments fail. Even under PPC's incorrect proposed construction, the "continuity member" and "shaped to fit" elements would be disclosed in the prior art. PPC admits that the prior art discloses continuity. Further, PPC has not established that the Board's findings on secondary considerations are not supported by substantial evidence.

## VII.    ARGUMENT

### A.    PPC Does Not Contest that the Second (Sandwiching) Embodiment Satisfies the Disputed Claim Limitations

PPC does not contest that the second, sandwiching embodiment achieves a "continuity member" or "electrical continuity member" which has "consistent contact with the nut and the post to maintain a continuous electrical connection between the nut and the post," "all of the time," "during operation of the connector," and "at all times during operation." Brief at 23-30. Nor does PPC contest that the second, sandwiching embodiment provides post and body surfaces which have "a complementary size and shape, and face[]" each other. Brief at 30-35.

Contrary to PPC's allegations, substantial evidence supports the Board's findings that one of ordinary skill in the art would have pursued known techniques for positioning Tatsuzuki's continuity member in the connector of Matthews,

including sandwiching the continuity member between the body and post of the connector.  A31-34; *see also* A120-22; A174-76; A220-22.  In the second, sandwiched embodiment considered by the Board, a portion of the continuity member of Tatsuzuki is sandwiched between the post and the body, and contacts the coupler/nut.  *Id.*  As illustrated below, the obviousness of the second, sandwiching embodiment is consistent with the known teachings of the Bence patent.



**Annotated Ex. 1034 Depicting the**
**Second Embodiment (A2995)**

**Annotated FIG. 6A of the**
**Bence Patent (A2949)**

Similarly, in the '320 Patent Family's FIG. 17 embodiment shown below, the continuity member is sandwiched between the post and body and contacts the coupler/nut.



**Annotated Excerpt of FIG. 17 (A439)**

PPC does not allege that the second, sandwiching embodiment fails to provide a continuity member which makes "consistent contact with the nut and the post to maintain a continuous electrical connection between the nut and the post." Brief at 23.  In fact, PPC admits that the "configured to fit" structure, which under PPC's construction encompasses sandwiching, "enables the post to engage the continuity member to maintain or extend a continuous electrical connection between the coupler and the post."  A1833 at ¶¶ 75-76; *see also Id.* at ¶ 91.  The sandwiching embodiment is encompassed by the "configured to fit" structure under PPC's construction because in such sandwiching embodiment, the post and body are parallel to each other and are "a complementary size and shape, and face" one another.

32

In light of the above, the sandwiching embodiment, which PPC has failed to adequately address on appeal, discloses all of the disputed claim limitations on appeal even under PPC's proposed construction.  Thus, this Court should sustain the Board's finding of the obviousness of the claims of the '060, '353, and '320 patents.  The Court does not need to reach the claim construction issues presented by PPC.

### B.     The Board Properly Construed Limitations which Include the Terms "continuity member" and "electrical continuity member"

Under the broadest reasonable construction standard, the Board correctly construed the claim limitations which include the terms "continuity member" and "electrical continuity member" to require that "the continuity member makes contact with the nut and the post to establish an electrical connection between the nut and the post."  A156; *see also* A10; A102; A207.  PPC's proposed construction that the claim terms "continuity member" and "electrical continuity member" should be construed to require "***consistent contact*** with the nut and post to maintain a ***continuous electrical connection*** between the nut and the post" is not the broadest reasonable interpretation.  Brief at 23 (emphases added).

### 1.     The Board's Construction of the "continuity member" and "electrical continuity member" Limitations is Consistent with the Specification

According to the specification, the "continuity member" or "electrical continuity member" is a <u>structural component</u> of the connector that facilitates the

extension of an electromagnetic interference shield (*i.e.*, a ground path) from the

cable and through the connector.  A334 at 1:20-22; A405 at 1:20-22; A476 at 1:16-

18.  FIG. 17 depicts an embodiment of the continuity member.  As discussed above,

the specification also discloses embodiments in which only a radially inner edge of

the continuity member contacts the post.  A482 at 14:6-8.



**Annotated Excerpt of FIG. 17 (A439)**

As shown, the continuity member 570 facilitates the extension of the ground path

by contacting the nut 30 (also referred to as a "coupler") and the post 40 to

establish an electrical connection <u>between the nut 30 and the post 40</u>.  A481 at

11:1-6, 17-23.

Accordingly, the Board's construction that the "continuity member" and

"electrical continuity member" limitations refer to a component that "make[s]

contact with the nut and the post to establish an electrical connection between the

34

nut and the post," is proper in light of the specification.  A102; *see also* A10; A156; A207.

> **2.    As a Structural Component, the Continuity Member Maintains the Ground Path by Extending the Ground Path Between the Components to which It is Connected**

As illustrated in the annotated excerpt of FIG. 20 below, the specification describes that the continuity member 70 is one of several components of the connector which collectively serve to maintain (*i.e.*, extend) an electrical ground path from the interface port 20 to the outer conductive grounding shield 14 of the cable.  The specification discloses that the "ground path *extends from* the interface port 20 to the nut 30, *to the continuity member 70*, to the post 40, to the conductive ground shield 14."  A482 at 14:20-30 (emphases added).[5]

---

[5] FIG. 20 depicts the nut 30 in a fully tightened position on the interface port 20. The continuity member 70 is designed to provide an unbroken ground path (see annotation) when the nut 30 is not fully tightened on the interface port 20.  *See* A482 at 14:20-24.



**Annotated Excerpt of FIG. 20 (A442)**

As a conductive, structural component, the continuity member 70 maintains (*i.e.*, extends) an electrical ground path between the interface port 20 and the conductive grounding shield 14 by being in contact with nut 30 and the post 40 to provide an electrical connection between the nut 30 and post 40.  A482 at 13:43-46, 14:22-30; A476 at 2:33-41.  Thus, the continuity member 70 maintains the extension of the ground path by being in contact with the nut 30 and the post 40 to allow for the ground path to extend between the nut 30 and the post 40.

### 3.    The Board Did Not Overlook or Ignore "maintain"

PPC alleges that the Board erred "in overlooking or ignoring the word 'maintain.'"  Brief at 23, 29.  The Board did not ignore "maintain."  The Board explicitly included "maintain" in its claim construction analysis, together with the

terms "continuity member" and "electrical continuity member."  A8-14; A153-56; A204-07.  The Board stated, "we decline to import limitations into the disputed claim limitations that would require the 'continuity member' to make 'consistent contact' with the nut and the post such that it maintains a 'continuous electrical connection' between these components."  A115-56.  The Board correctly interpreted the claims in light of the specification's emphasis on fundamental features of the invention.  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008).  As discussed above with respect to FIG. 20, the specification describes that the continuity member 70, as a conductive component, maintains (*i.e.*, extends) an electrical ground path between the interface port 20 and the conductive grounding shield 14 by being in contact with the nut 30 and the post 40 to provide an electrical connection between the nut 30 and post 40 so that the ground path can be continuous (*i.e.*, unbroken) from the interface port 20 to the conductive grounding shield 14.  A482 at 13:43-46, 14:22-30.  Therefore, the continuity member "maintains" a ground path by extending the ground path between the components to which the continuity member is connected, such as the nut and post.

### 4.    PPC's Own Extrinsic Evidence Supports the Board's Construction

In support of its construction, PPC asserts that a dictionary definition of "continuity," *i.e.*, "1. The state or quality of being continuous," constitutes the

ordinary meaning of such term. A1834 at ¶ 78; A2967. Such dictionary defines "continuous" as "1. Uninterrupted in time, sequence, substance, *or* extent." A2967 (emphasis added). According to PPC's own dictionary definitions, the terms "continuity" and "continuous" encompass "uninterrupted in sequence or extent" and are not limited to requiring "uninterrupted in time." PPC's own extrinsic evidence supports the Board's determination that the disputed terms do not require a specific duration of time of the electrical connection. A8-9; A100-01; A154-55; A205-06. The ground path is merely a physical route, and the definition of continuous that requires the path to be unbroken in extent from one end of the path to the other end is reasonable, and consistent with the ordinary and customary meaning, whereas PPC's contention that "continuous" connotes a *temporal* extent is not reasonable.

### 5.   The Term "continuous" Means an Unbroken Ground Path

The term "continuous" according to the specification refers to an unbroken ground path, not to an electrical connection that exists "all of the time," "during operation of the connector," or "at all times during operation" as alleged by PPC. This is true for two reasons. First, as discussed above, PPC's own extrinsic evidence demonstrates that "continuity" and "continuous" encompass "uninterrupted in sequence or extent" and are not limited to requiring "uninterrupted in time." A2967. Second, such construction of "continuous" is

38

consistent with the specification.  PPC relies on the following portion of the specification:

> The ground path *extends from* the interface port 20 to the nut 30, *to the continuity member 70*, to the post 40, to the conductive ground shield 14.  Thus, this *continuous* grounding path provides operable functionality of the coaxial cable connector 100 allowing it to work as it was intended even when the connector 100 is not fully tightened.

A482 at 14:24-30 (emphases added); Brief at 26-27.  Thus, a "continuous" ground path is an unbroken ground path that extends from the interface port to the nut, to the continuity member, to the post, to the conductive ground shield.  The continuity member, as a conductive component, facilitates the extension of the ground path between the nut and the post by being connected to the nut and the post.  In the context of the specification and PPC's own extrinsic evidence, the "continuous" ground path pertains to an unbroken ground path, and does not require a duration of time.  The ground path is part of an electrical circuit and hence must be "continuous" in the sense of an unbroken or not shorted circuit.  The specification does not require "continuous" to refer to an electrical connection that exists "all of the time" or any of the other ambiguous temporal limitations proposed by PPC.  The Board's construction of "continuity member" and "electrical continuity member" is consistent with the specification's usage of "continuous."

Further, PPC is incorrect that the Board's construction requires a "momentary contact at some undefined moment in time."  Brief at 23-24.  The Board did not construe the claims to *require* momentary contact, as PPC alleges. The Board's construction does not require any specific duration of time during which the electrical connection exists between the coupler/nut and post.  This is entirely consistent with the specification which, as discussed above, does not describe the term "continuity" in "continuity member" and "electrical continuity member" to require a specific duration of time of the electrical connection.

The Board did not adopt a special definition that is inconsistent with, opposite to, or deviates from the ordinary meaning of the claim terms "continuity member" and "electrical continuity member" as used in the specification.  The Board's definition of "continuity member" and "electrical continuity member" is consistent with the specification and the interpretation that one skilled in the art would reach in view of the disclosure of '320 Patent Family.  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010); *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999).

### C.    PPC's Proposed Construction is Not the Broadest Reasonable Interpretation

PPC's proposed construction of the terms "continuity member" and "electrical continuity member" as requiring "consistent contact" and a "continuous electrical connection" is not the broadest reasonable interpretation for at least three

reasons: (1) PPC's construction renders the claims indefinite; (2) such construction improperly imports limitations from the specification into the claims; and (3) PPC's construction is inconsistent with the prosecution history of the '320 Patent Family.

### 1.    PPC's Construction Renders the Claims Indefinite

In the IPRs, PPC did not provide a clear explanation of the level of reliability or robustness required by "consistent contact."  Nor did PPC define the period of time required by "continuous electrical connection."  In light of the ambiguity of PPC's proposed construction, the Board correctly refused to construe the claims to "require some undefined level of consistency, reliability, or robustness of an electrical connection between the coupler/nut and post over some undefined period of time."  A10; A101-02; A155; A207.

Recognizing the flaws of its proposed construction of "continuity member," PPC now argues that "a person skilled in the art would understand that the continuity member must be configured to maintain the electrical connection ***all of the time***."  Brief at 30 (emphasis added).  PPC's new argument does not explain what ***level of reliability or robustness*** is required by ***"consistent contact."***

In fact, PPC admits that there are varying levels of reliability of continuity. Brief at 10 ("The patents also teach other embodiments…***to improve*** continuity…. By securing the components axially and rotationally, the continuity member can

41

provide *more reliable* continuity.  [Emphases added.]").  As the Board correctly

determined, under the broadest reasonable construction standard, the term

"continuity" does not require some undefined level of consistency, reliability, or

robustness of an electrical connection over some undefined period of time.  A10;

A102; A155; A207.

> **2.    PPC's Attempt to Import "consistent contact" and "continuous electrical connection" from the Specification into the Claims is Improper**

PPC's attempt to import time, quality, and reliability limitations into the

term "continuity member" is improper.  On appeal, PPC alleges that portions of the

specification require the term "continuity member" to be construed so as to

"maintain a consistent and continuous connection."  Brief at 25-27.  PPC is

mistaken for two reasons.  First, PPC fails to clearly explain why the proposed

"consistent contact" and "continuous electrical connection" limitations are

necessarily tied to the disputed term "continuity member."  PPC has not explained

why "continuity" in the disputed term "continuity member" gives rise to the

"consistent contact" and "continuous electrical connection" limitations.

Second, the broadest reasonable interpretation of "continuity" in "continuity

member" does not limit such term to the level of performance purportedly

disclosed in the specification.  As discussed above, PPC's own extrinsic evidence

shows that "continuity" does not require that the electrical connection be uninterrupted in time.

The appealed claims themselves do not specify that the term "continuity" in "continuity member" and "electrical continuity member" requires "consistent contact" nor a "continuous electrical connection."  A343 at 20:56-A345 at 24:16; A414 at 20:56-A416 at 24:58; A485 at 20:54-A487 at 24:65.  PPC cites to the connector in FIG. 50 and alleged support from the specification.  Brief at 26-27, 30.[6]  PPC admits that "[o]ther parts of the specification describe *further embodiments of the continuity member* such that it makes 'constant physical and electrical contact ….'"  Brief at 27 (emphasis added).  However, PPC has not explained why the continuity member must be limited to FIG. 50 or such "further embodiments" described in the specification.  Importing such limitations from the specification into the claims is improper.  *See Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.").

---

[6] PPC cites to A482 at 14:20-30; A476 at 1:49-53; A483at 15:2-10; A484 at 18:52-59; A483 at16:5-17; A485 at 18:52-59.

PPC now argues that the disputed claim terms require the continuity member to maintain an electrical connection "*all of the time*," that "certain claims require the continuity member to 'maintain electrical continuity' *during operation of the connector*," and that "the specification requires the continuity member to be configured to maintain a continuous ground path *at all times during operation*." Brief at 23-24, 30 (emphases added). PPC's constructions encompass "at all times during operation" as well as "during operation of the connector," *i.e.*, without requiring "at all times." One of PPC's own constructions does not require the electrical connection to exist at all times. Further, none of the claims at issue recite "all of the time," "during operation of the connector," or "at all times during operation." In the IPRs, PPC did not provide any rationale as to why the claims require that an electrical connection exists "all of the time," "during operation of the connector," or "at all times during operation," and PPC fails to do so now. PPC's own dictionary definitions do not support its construction. Once again, PPC is improperly importing limitations into the claims.

If the term "maintain" were construed to require an electrical connection to exist "all of the time," "during operation of the connector," and "at all times during operation" as PPC alleges, limitations in the claims reciting the specific condition during which the electrical connection exists impermissibly would be rendered meaningless. Each of claims 7 and 20 of the '353 patent and claims 8, 16, and 31

44

of the '320 patent recite a specific condition (*e.g.*, "when the post rotates relative to the nut," "when the post rotates relative to the nut") during which the electrical connection exists at a given point in time. A415 at 22:44-45; A416 at 24:23-24; A486 at 21:50-52; A486 at 22:64-65; A487 at 24:42-44. Construing "maintain" to require an electrical connection to exist "all of the time," "during operation of the connector," and "at all times during operation" as PPC proposes would assign no meaning to such limitations. PPC's construction which requires the electrical connection to exist eternally under any and all conditions is not reasonable.

As correctly determined by the Board, "the claimed 'continuity member' does not cease to be a continuity member, as would be understood by one skilled in the art, simply because the contact made between the coupler/nut and post may not be consistent to maintain a continuous electrical connection between these components." A10; A101-02; A155; A207. Dr. Eldering admits that PPC uses the term "continuity member" to describe "a highly conductive element." A1814 at ¶ 22. The continuity member exists as a continuity member regardless of whether it performs its function perfectly.

### 3. PPC's Construction is Inconsistent with the Prosecution History of the '320 Patent Family

In an *inter partes* reexamination of U.S. Patent No. 8,192,237, which is a continuation of the '320 patent, PPC amended its claims to recite that the continuity member has a post contact portion and a nut contact portion which

45

"make[s] *consistent physical and electrical contact* with" the post and nut,

respectively. A10408-19; A10455-56. Further, in U.S. Patent No. 8,801,448,

which is a grandchild of the '320 patent, PPC presented claims that further limited

the continuity structure to require a "*consistent* electrical ground path" (claims 1,

33, 40, 47-49) and "*consistent contact* with the post structure and the coupler

structure" (claims 24, 66, 112). PPC's prior representations take the position that

the term "continuity member," alone, does not require the "consistent" and

"continuous" limitations it now seeks.

### 4.  PPC's Allegations Concerning "electrical continuity" and "electrical connection" are Untenable

Concerning claim 20 of the '353 patent, PPC argues that "when the

inventors used the term 'electrical continuity,' they meant something more than a

mere connection." Brief at 29. Even if "electrical connection" must mean

something different than "electrical continuity," this does not necessitate PPC's

construction. The specification states that "the continuity member 70 physically

and electrically contacts both the nut 30 and the post 40, *thereby extending ground

continuity between the components*." A482 at 13:43-46 (emphases added).

Continuity between the components is provided by an electrical connection

between the continuity member and the nut and post components. In claim 20,

therefore, the term "electrical connection" describes the manner in which the

continuity member participates in facilitating "electrical continuity."

46

Furthermore, PPC's argument with respect to claim 20 of the '353 patent contradicts its argument that "continuity member" and "electrical continuity member" should be construed to require "consistent contact with the nut and post to maintain a continuous electrical connection between the nut and the post." If "electrical continuity" should be interpreted to mean something different than "contact" and "connection," why then should "continuity member" or "electrical continuity member" be interpreted to require "consistent contact" and a "continuous connection?"

### D. The Board Properly Construed "shaped to fit" and "configured to fit"

PPC argues that the terms "configured to fit" and "shaped to fit" should mean that one surface has "a complementary size and shape as, and faces," another surface. Brief at 31. PPC is incorrect.

#### 1. The Ordinary Meaning of "configured to fit" and "shaped to fit," and the '320 Patent Family Specification Do Not Require Opposing Complementary Surfaces

PPC admits the ordinary meaning of "fit" is that an object is properly sized and shaped. *Id.*; A2988. No dictionary definition offered by PPC includes wording that these surfaces must also face each other. *Id.*

PPC refers to the specification of the '320 Patent Family and alleges that it describes a portion of the post as being "configured to fit" or "shaped to fit" a portion of the connector body. Brief at 31. The specification of the '320 Patent

47

Family, outside of the claims, does not describe portions of the post and connector body as being "configured to fit" or "shaped to fit."  PPC is instead referring to one of the claims that contain the terms at issue.  *Id.*

Nor does the '320 Patent Family specification associate the terms "configured to fit" and "shaped to fit" with the description of surfaces 1235 and 1245 shown in FIG. 50, as alleged by PPC.  Brief at 33.  These surfaces 1235, 1245 are described as being opposing complementary surfaces, not as being surfaces "configured to fit" or "shaped to fit" each other.  *See, e.g.,* A485 at 19:45-48.  PPC does not explain why surfaces 1235, 1245 constitute the only construction for the terms "configured to fit" and "shaped to fit," or why an ordinarily skilled artisan would consider these surfaces to understand the claim terms.

PPC alleges the Board improperly relied on Corning's expert's understanding of the ordinary meaning of "fit" in which he stated that surfaces that are perpendicular to each other would, if they had some thickness, be configured to fit each other.  Brief at 32.  To support this proposition, PPC refers to a statement by a member of the Board regarding the state of mind of the expert.  *Id.*  PPC, however, omits the remainder of the Board member's statement which was "[Corning's expert's] testimony is essentially yes, it can be a perpendicular arrangement … provided there is some other conditions that are met?"  A560 at ll. 5-12.

PPC omits its ***own expert's testimony*** that perpendicularly arranged surfaces, such as the body and post surfaces in Matthews, may be considered as being "shaped to fit" each other.  A2614 at ll. 17-22 ("[T]he post [is] structured and designed to be suitably arranged with the body in figure 19 of the '320 patent.") This testimony is consistent with PPC's expert's understanding of the meaning of "fit" and confirms that the Board's construction, which does not exclude perpendicular surfaces, is reasonable.  A2613 at ll. 10-22; A2614 at ll. 3-9 ("I would say fit would mean appropriately arranged, configured, conformally arranged … suitably arranged, suitably surfaced.")

### 2.    The Usage of "fit" in the '320 Patent Family Does Not Exclude Perpendicular Surfaces

PPC identifies a portion of the '060 patent specification describing embodiments illustrated in FIGS. 5-7.  Brief at 32-33; A340 at 13:15-20.  Based on this portion of the specification, PPC argues that if surfaces had perpendicular surfaces, "they could not be axially and rotationally secured as the specification describes."  *Id.*

Contrary to PPC's allegations, perpendicular surfaces that are "configured to fit" or "shaped to fit" each other will prevent movement of the surfaces relative to each other because one perpendicular surface will prevent, through physical interference, the movement of the other surface in the direction extending along the one perpendicular surface.  This conforms with the '060 patent's usage of fit when

stating "structures which physically interfere with each other in axial and/or

rotational configurations" may be considered to fit each other.  A340 at 13:20-23.

### 3. The Construction of "configured to fit" and "shaped to fit" Does Not Render the Claimed Invention Inoperable

PPC argues that the Board's construction of the claim terms renders the

claims inoperable because a continuity member could not extend between the two

surfaces.  Brief at 33-35.  This is an unnecessarily narrow construction of the

meaning of the term "between" recited in the claims and is presented for the first

time on appeal.  As observed by the Board during oral argument, "[r]ight angularly

placed surfaces … can still hold something."  A561 at ll. 11-17.  Placement of

Tatsuzuki's continuity member 13 to be held by perpendicular surfaces that are

"configured to fit" and "shaped to fit" each other satisfies the ordinary and

customary meaning of the word "between."  By being held by the two

perpendicular surfaces, the continuity member 13 is between these two surfaces.

PPC fails to explain why this construction of "between" would render the claims

inoperable.

The Board therefore correctly concluded that components or surfaces that

are "shaped to fit" or "configured to fit" one another are sized and dimensioned to

abut one another, and that this meaning does not exclude an arrangement of the

components in which they are situated perpendicularly to one another.  *See, e.g.,*

A13.  The surfaces of the Matthews post 40 and connector 50 that the Board found

50

to be "shaped to fit" or "configured to fit" one another are shown in the annotated excerpt of Matthews's FIG. 1 below.  *See, e.g.,* A30.



**Annotated Excerpt of FIG. 1 of Matthews (A1077)**

### E.    The Board's Findings of Obviousness Should Not Be Reversed

#### 1.    Even Under PPC's Construction, the Claimed "continuity member" and "electrical continuity member" Limitations are Obvious in View of Matthews and Tatsuzuki

PPC's argument concerning whether Matthews or Tatsuzuki discloses the "continuity member" claim limitation is predicated exclusively on this Court overturning the Board's claim construction.  Brief at 37.  If the Board's claim construction is upheld, PPC's allegations of missing claim limitations fail.

As discussed above, PPC does not contest that the second, sandwiching embodiment does not meet all the disputed claim limitations, even under PPC's construction.  Further, the claims are also obvious even under PPC's construction

according to the first embodiment in which Tatsuzuki's continuity member is

press-fit into Matthews's connector, as shown below.



**Annotated Ex. 2007 (A2993)**

In the first embodiment, the continuity member of Tatsuzuki is press-fit

between the coupler/nut, post and body of Matthews's connector. According to the

specification of the '320 Patent Family, press-fitting is a "simple" technique that

can be used to secure a continuity member. A480 at 9:18-24 ("embodiments of a

continuity member 70 may also reside in a secure position . . . simply through

press-fitting and friction-fitting forces engendered by corresponding tolerances");

A479 at 8:31-33; A482 at 13:15-18. This is consistent with Dr. Mroczkowski's

testimony that it would have been obvious to secure Tatsuzuki's continuity

member by press-fitting. A2276 at ll. 8-21; A1966 at ll. 22-25; A1968 at ll. 14-18;

A1970 at ll. 13-21.

In the first embodiment, the continuity member makes "consistent contact with the nut and the post to maintain a continuous electrical connection between the nut and the post."  Brief at 23.  Furthermore, as is illustrated in the first embodiment, the continuity member of Tatsuzuki is arranged to "extend between the post and body of Matthews to maintain consistent contact as the claims require." *Id.* at 40-41.  Therefore, PPC's argument that the first embodiment does not disclose the continuity member limitations is incorrect.

PPC also contends that the Board did not "find" that Tatsuzuki's continuity member could be press-fit in Matthews's connector in the first embodiment.  Brief at 40-41.  This argument is misleading and incorrect.

As noted above, Dr. Mroczkowski testified that it would have been obvious to secure Tatsuzuki's continuity member in Matthews's connector by press-fitting.  A2276 at ll. 8-21; A1966 at ll. 22-25; A1968 at ll. 14-18; A1970 at ll. 13-21.  The Board reproduced Dr. Mroczkowski's first embodiment "as it has been presented in Patent Owner's Response," which references Dr. Mroczkowski's testimony on press-fitting.  A118.  The Board indicated that, "[a]s offered by PPC," the illustration of the first embodiment reproduced in its Decision "depicts an opinion of Dr. Mroczkowksi as to an implementation of Tatsuzuki's continuity member 13 positioned with respect to nut, post, and body surfaces of Matthews connector." A118-19.  The Board stated that:

> [i]n considering the proposed implementation of Tatsuzuki's teachings onto Matthews's connector in the illustration [of the first embodiment], contrary to PPC's assertion, **the illustration encompasses the features laid out in the claims**. The illustration depicts Tatsuzuki's disc-shaped spring 13 positioned with respect to portions of Matthews's connector identifiable as nut 30, post 40, and connector body 50. We are satisfied that **the noted implementation conveys a continuity member positioned to contact a rearward surface of the nut and extend between the post and connector body**.

A119 (emphases added). Therefore, contrary to PPC's argument, the Board found that Tatsuzuki's continuity member 13 could be press-fit in the Matthews connector. By expressly referring to the press-fit embodiment and finding that it would have been obvious to incorporate Tatsuzuki's continuity member into Matthews's connector in this manner to extend between the nut, body and post to facilitate an electrical connection between the nut, body and post, the Board found that it would have been obvious to press-fit Tatsuzuki's continuity member into Matthews's connector. *Id.*

### 2.    PPC's Arguments Against the References are Not Supportable

PPC contests the obviousness of its claims by arguing that the continuity member 13 of Tatsuzuki performs a "floating spring operation between the nut and the body" such that it "makes a connection between the nut and the body, not the nut and the post as the claims require." A36. PPC also argues, for the first time on appeal, that Tatsuzuki "teaches away" from "continuous or consistent contact with

54

the post." A38-44. PPC's arguments fail for two reasons: (1) PPC is impermissibly attacking the references individually rather than the combination which the Board determined to be obvious, and (2) none of the references "teach away" from the feature of a continuity member having "continuous or consistent contact with the post."

One cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references. *In re Keller*, 642 F.2d 413 (CCPA 1981); *In re Merck & Co., Inc.,* 800 F.2d 1091 (Fed. Cir. 1986). Notwithstanding this well-settled principle, PPC's arguments are directed to the references individually, not the underlined combination of Matthews and Tatsuzuki considered by the Board. The Board correctly determined that, based on the entirety of the record, "Tatsuzuki's disc-shaped spring 13 forms a 'continuity member' as required by the claims" of the '320 patent, '353 patent and the '060 patent, and that one skilled in the art "would have appreciated reasonably that such a spring may be arranged in the coaxial connector of Matthews so as to form a continuity member or electrical continuity member positioned to contact the nut, post, and body components of a coaxial cable connector in the manner required by the claims." A175-76.

PPC alleges that "a person skilled in the art would not have combined the spring of Tatsuzuki in the body and post of Matthews by press-fitting or

sandwiching." Brief at 42-44. Specifically, PPC alleges that sandwiching Tatsuzuki's continuity member between the post and body of Matthews in the manner taught by the Bence patent "would crush it flat." Brief at 43. However, as can be seen from FIG. 6A of the Bence patent, while the ring portion of the continuity member is sandwiched between the body and the post, the spring portion of the continuity member is not sandwiched but rather is free to axially extend away from the ring portion and contact the nut:



**FIG. 6A of the Bence Patent (A2949)**

Like the continuity member of the Bence patent, the Tatsuzuki continuity member (disc-shaped spring 13), which is shown below, includes a ring portion (ring-shaped interface 13a) and springs (spring pieces 13b):



**FIGS. 7a, 7b of Tatsuzuki (A1011)**

Incorporating the Tatsuzuki continuity member 13 into the Matthews

connector in the manner evidenced by the Bence patent would not have resulted in

the springs 13b of the Tatsuzuki continuity member 13 being crushed flat, as PPC

alleges. Rather, when incorporated into the Matthews connector, the ring shaped

interface 13a of the Tatsuzuki continuity member 13 would be sandwiched

between the body and post, whereas the springs 13b would be free to axially

extend away from the ring shaped interface 13a and contact the nut. In the

Matthews-Tatsuzuki combination, the springs 13b, which are resilient flexible

portions of the Tatsuzuki continuity member 13, are biased against the nut of the

Matthews, as shown in both of the first and second embodiments. A2993; A2997;

A1761 at ¶¶ 227-28; A1170 at ¶¶ 119-20. In this arrangement, the springs 13b

would be in consistent physical and electrical contact with the nut of Matthews so

that the Tatsuzuki continuity member makes consistent contact with the nut and

57

post to maintain a continuous electrical connection with the nut and the post. A1761 at ¶¶ 227-28; A1170 at ¶¶ 119-20.

PPC also alleges that "the intended purpose of Tatsuzuki's spring is to float between the nut and the body" and "the spring in Tatsuzuki sits loosely around the post and floats in order to perform its function." Brief at 42-43. However, Tatsuzuki does not teach that its continuity member <u>must</u> be allowed to "float" between the nut and body, as PPC alleges. PPC cites to paragraphs 33 and 51 of Dr. Eldering's declaration, but neither paragraph provides any indication as to where Tatsuzuki teaches that the continuity member must "float." *Id.* at 42.

PPC's allegation that Tatsuzuki's continuity member <u>must</u> float between the nut and body is contrary to what is actually shown in FIG. 3 of Tatsuzuki:



**Annotated Excerpt of FIG. 3 of Tatsuzuki (A1035)**

As shown in the annotated excerpt of FIG. 3 of Tatsuzuki above, the continuity member of Tatsuzuki is positioned between portions of the nut 12 (*e.g.*,

at point A) and the portions of the plug body 11 of Tatsuzuki corresponding to the post (*e.g.*, at point B) and the connector body (*e.g.*, at point C).  A1435-36.  Thus, Tatsuzuki's continuity member contacts the nut, body, <u>and</u> post and thereby extends between the nut, body and post, so that the continuity member extends electrical grounding continuity through the nut, body, and post, as recited in the claims of the appealed patents.  A1738-39.

PPC's expert, Dr. Eldering, agrees, testifying that Tatsuzuki's continuity member contacts the post portion of the plug body 11.  A2732 at ll. 2-12 ("it is touching the post surface").  Rather than criticizing, discrediting, or discouraging press-fitting and sandwiching the Tatsuzuki continuity member, the prior art demonstrates that "[t]here … is a finite number of identified, predictable solutions" and "an ordinarily skilled artisan would have had reason to pursue known options within his or her technical grasp when contemplating where, and how, to position Tatsuzuki's disc shaped spring 13 in Matthews's connector."  A175; *see In re Fulton,* 391 F.3d 1195, 1201 (Fed. Cir. 2004).  Thus, contrary to PPC's assertion, Tatsuzuki does not "teach away" from the claims.

### 3.    **"Configured to Fit" or "Shaped to Fit" are Obvious**

PPC's argument concerning whether Matthews or Tatsuzuki discloses the "shaped to fit" or "configured to fit" claim limitation is predicated exclusively on

this Court overturning the Board's claim construction, and fails if the Court does not. Brief at 45.

Even if PPC's construction of the terms "configured to fit" and "shaped to fit" were adopted by this Court, the combination of Matthews and Tatsuzuki would still render the claims obvious. Corning's expert offered two possible embodiments of the combination of the Matthews and Tatsuzuki connector, referred to as the press-fit or first embodiment, and the sandwiching or second embodiment. Illustrations of these two embodiments are reproduced below.




**Annotated Ex. 2007 Depicting the First Embodiment (A2993)**   **Annotated Ex. 1034 Depicting the Second Embodiment (A2995)**

If PPC's proposed construction of "configured to fit" and "shaped to fit" are adopted so that a perpendicular arrangement of surfaces is excluded, Corning's second, sandwiching embodiment is another obvious result from the combination of Matthews and Tatsuzuki. In the sandwiching embodiment, the Tatsuzuki

continuity member 13 is placed between a continuity body engaging surface and a continuity post engaging surface that face each other.  Accordingly, this embodiment renders obvious claim 1 of the '060 patent.  The sandwiching embodiment also discloses a portion of the post that includes an outer surface shaped to fit the portion of the connector body as recited in claims 16 and 24 of the '353 patent and claim 28 of the '320 patent.  PPC agrees that this embodiment of the Matthews and Tatsuzuki combination would disclose surfaces that satisfies its construction of "configured to fit" and "shaped to fit."  Brief at 46-47.

PPC's only argument against the obviousness of this embodiment is that Tatsuzuki's disclosure "teaches away" from such an arrangement.  As discussed above, Tatsuzuki's disclosure is not a teaching away from such a combination.  Accordingly, even if the Court finds PPC's construction of these claim terms to be proper, the claims are still rendered obvious by the combination of Matthews and Tatsuzuki.

### F.     Substantial Evidence Supports the Board's Conclusions on Secondary Considerations

PPC's cursory arguments fail to address why the Board's individual findings on secondary considerations should be reversed in light of the substantial evidence standard.  This standard is inherently deferential to the factual findings of the Board, which cannot be overturned based on PPC's cursory arguments.  *See K/S Himpp*, 751 F.3d at 1364.

61

### 1.     The Board Relied on Substantial Evidence in Reaching Its Secondary Considerations Findings

PPC's Brief conflates separate secondary considerations.  Brief 47-51.  But the Board separately considered in great detail long felt need, failure by others, copying, and commercial success.  A39-50; A126-38; A179-90; A223-34.  The Board's determination on secondary considerations contains detailed analyses of the facts as presented by both parties and support for the Board's conclusions.  *Id*.

### 2.     Long-felt But Unsolved Need

PPC argued to the Board that the problem addressed by PPC's patents "is that 'often connectors are not properly tightened or otherwise installed to the interface port and proper electrical mating of the connector with the interface port does not occur.'"  A39.  The Board cited PPC's contention in its holding that the record was persuasive that "coaxial connectors known in the art before 2009 had 'solved' PPC's asserted 'long- felt' need."  A39-40.

The Board relied on known solutions in the prior art.  The Board indicated that "the Bence '990 patent … which issued in 2006, disclosed a connector having a 'grounding member,' *i.e.*, a continuity member, placed between a coupler/nut and post … [T]he Bence '990 patent states that an electrical grounding path is maintained between the coupler and the tubular post 'whether or not the coupler is tightly fastened to the appliance.'"  A40 (citations omitted).  The Board also cited Tatsuzuki's disclosure of a "connector that included disc-shaped spring 13, which

provided an 'electrical connection' between plug body 11 and rotary mounting element 12 of the connector" and that "Tatsuzuki states that it provides 'a coaxial plug without deterioration of insertion loss characteristics and reflection loss characteristics even in the state when the coaxial plug is loosened.'"  *Id*.  PPC has not addressed this substantial evidence which supports the Board's conclusions.

### 3.     Alleged Failure of Others

PPC also does not explain how the Board erred in evaluating the evidence concerning failure of others.  PPC's did not submit any evidence of failure by other industry participants to the Board and focused only on Corning's alleged failures. *See, e.g. Alco Standard Corp. v. Tennessee Valley Auth.*, 808 F.2d 1490, 1500 (Fed. Cir. 1986) (finding evidence supporting "district court's finding that others in the industry were unable to solve the problem").

PPC ignores the Board's extensive rebuttal, based on Corning's evidence, of PPC's allegations.  A40.  The Board recognized PPC's contention that "from September 2008 until March 2010, Corning's Mr. Burris attempted, but failed, 'to incorporate a continuity member into the UltraRange connector.'"  *Id*.  But the Board held that "the record before us indicates that Corning prepared connectors with continuity members that maintained electrical continuity in the September 2008 to March 2010 time frame, even if Corning did not sell such connectors to customers for whatever reason."  A41.

The Board cited numerous successful Corning designs that were not commercialized for various reasons.  A41-42 (discussing continuity success of Corning designs RC-1350-1 Rev 01,  RC-1350-50 Rev 02, RC-1350-70, RC-1350-80,  RC-1350-50, RC-1350-90, and RC-1350- 150).  This substantial evidence supports the Board's conclusion that "some designs did work as connectors, even if Corning did not pursue those designs commercially for reasons such as 'production expense' or 'difficulty in turning the nut.'"  A42.

### 4.    Alleged Copying by Corning

PPC's argument on copying ignores that the Board's finding on copying was qualified.  A44; Brief at 49.  The Board merely held that there was "*some* evidence of objective indicia of non-obviousness, *i.e.*, copying by Corning of PPC's EX Plus SignalTight design, in relation to the challenged claims."  A44 (emphasis added).  In fact, Corning's designer denied copying.  A10365 at ll. 15-16.  The Board also acknowledged Corning's evidence that Corning's UltraShield connector is fundamentally different from PPC's SignalTight connector in numerous respects.  A44.

Because "copying requires evidence of *efforts to replicate a specific product*," evidence of these differences undermines any conclusive finding on copying.  *See Wyers v. Master Lock,* 616 F.3d 1231, 1246 (Fed. Cir. 2010) (emphasis added).  Corning submitted extensive evidence establishing the

numerous differences between the parties' continuity members and overall

connector design.  A10508-21.  For instance, front and side views of the parties'

continuity members show they are markedly different:



| **Side View of PPC SignalTight Continuity Member (A10513)** | **Side View of Corning UltraShield Continuity Member (A10513)** |

PPC's SignalTight continuity member includes "nut contact tabs" that

extend away from the "bowed beam" towards the nut, and a "post contact portion"

that extends away from the main plane of the continuity member and the nut.

A10513-14 at ¶ 14.  Corning's UltraShield continuity member includes a "straight

cantilever beam" with an "angle bend" that produces a "knife edge contact" at the

outer perimeter of the contact beam, and includes a flat surface which does not

have a radiused portion that forms a curve narrowing into a collar or sleeve.

A10514 at ¶ 15.



**Front View of PPC SignalTight Continuity Member (A10512)**     **Front View of Corning UltraShield Continuity Member (A10512)**

PPC's SignalTight continuity member has a nut contact tab (1278a) for providing point contact where continuity is maintained between the nut, the continuity member, and the post.  A10512 at ¶ 10.  PPC's SignalTight continuity member has a beam length defined by bend lines that are oriented vertically.  *Id.* at ¶ 12.  The bend lines in Corning's UltraShield continuity member are oriented horizontally.  *Id.* at ¶ 13.  Corning's UltraShield continuity member has cantilevered annular beams that bias the knife edge of the beams against the nut. *Id.* at ¶ 11.  Corning has even sought a patent for its unique cantilevered beam, as acknowledged by PPC.  Brief at 2; A10523-25, A10530, ¶¶26-28, A10532, claims 1, 3, 11, 12, 16 and 18.

Although Corning disputes that there is any evidence of copying, PPC has not established that the Board's qualified finding of alleged copying is sufficient to overcome the "strong evidence of obviousness" of PPC's claims.  A234; *see also Cable Elec. Prods. Inc. v. Genmark Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985) ("more than the mere fact of copying . . . is needed to make that action significant to a determination of obviousness issue.").

###### 5. The Board's Findings on Commercial Success are Supported by Substantial Evidence and Not Inconsistent with Its Qualified Findings Regarding Alleged Copying

PPC argues that the Board's finding of *some* evidence of copying is inconsistent with its finding of lack of proof of commercial success.  Brief at 50. But the Board said clearly that "PPC fails to show that the relevant marketed products embody *all* claimed features" (emphasis added) or "*all* elements of the challenged claims" (emphasis in original).  A45-46.  There is no inconsistency in such a finding.  PPC's argument continues this failed logic by resting solely on an alleged inconsistency in the Board's findings to establish that the relevant products embody the claims.  Brief at 49-50.

PPC fails to address the Board's numerous concerns with PPC's commercial evidence.  A47-48.  PPC ignores the Board's finding that PPC's overall market share "remained the same, or slightly decreased, from 2009 to 2013" as PPC introduced its SignalTight connectors.  A47.  PPC failed to submit evidence

67

showing a significant market share of the overall connector market.  A48.  PPC

does not address the Board's concern that it "cannot tell from the record before us

whether the asserted 'commercial success' …might have been due to a pre-existing

market share."  *Id*.

PPC further fails to address the Board's finding of its prior failure to

establish nexus between the claimed inventions and PPC's alleged sales success.

*See* A49.  Corning presented evidence that packaging of PPC's SignalTight

connectors was marked with several patents related to compression of the back end

of the connectors, not continuity, and were not marked with the '320 Patent Family.

A10454; A10473; 10470-72.  There is no presumption that the product's success

was due only to one patent where the product was marked with, and embodied,

another patent for years while it was on the market.  *Therasense, Inc. v. Becton,*

*Dickinson and Co.,* 593 F.3d 1289, 1299 (Fed. Cir. 2010), *aff'd in relevant part,*

*overruled on other grounds*, 649 F.3d 1276, 1296 (Fed. Cir. 2011).  PPC's expert

admitted that the "compression features were patented," contributed to the success

of EX connectors, and were incorporated into SignalTight.  A2772 at l. 25-A2774

at l. 14.  PPC sales literature also touts numerous unclaimed SignalTight features:

"large tapered compression area . . . keeping moisture out," "nickel-plated Brass

construction," "Gas-tight sealed connection" and "innovative nut design."  A10522.

The Board extensively reviewed PPC's "evidence" and detailed its failures of proof concerning sales and market share.  A45-49.  The Board further held "PPC does not clarify how that commercial success was due to features recited in the challenged claims (*e.g.*, a continuity member in a specific location) rather than features (*e.g.*, a continuity member) expressly described in the prior art, such as in Matthews, Tatsuzuki, and the Bence patent."  A49.  The Board's findings were consistent with the requirement that PPC must offer proof that its alleged sales "were a direct result of the unique characteristics of the claimed invention -- as opposed to other economic and commercial factors."  *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

PPC argues that the Board's finding on alleged copying demonstrates commercial success which necessitates a remand on secondary considerations.  As stated above, the Board's copying finding does not establish commercial success and Corning disagrees that there is any evidence of copying.  Regardless, a qualified finding of some evidence of copying is not enough to reverse and remand.  As the Board noted, this Court has held that "a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations."  *Ecolochem, Inc. v. S. California Edison Co*., 227 F.3d 1361, 1380 (Fed. Cir. 2000); *see also Cable Elec. Prods.*, 770 F.2d at 1028.

69

### 6. PPC's Improper Claim Constructions Do Not "Save" Its Secondary Considerations Arguments

PPC now contends that a different construction of "continuity member" necessitates a remand for reevaluation of secondary considerations. Brief at 51-52. PPC's only example is reconsideration of long-felt need for a consistent or continuous electrical connection. But PPC never made any such argument below. In reaching its conclusion on long-felt need, the Board cited the broad definition of the allegedly long-felt problem that PPC *itself* proposed.

As stated above, PPC contended that "the problem addressed by its patents is that 'often connectors are not properly tightened or otherwise installed to the interface port and proper electrical mating of the connector with the interface port does not occur.'" A39. PPC never proposed to the Board a definition of long-felt need tied to its proposed claim constructions. Nor has PPC explained how any other secondary consideration is tied to a construction of "continuity member." PPC has not established grounds for remand based on a construction of "continuity member."

## VIII. CONCLUSION

For the foregoing reasons, Appellee respectfully requests that this Court affirm the Board's final decisions.

Respectfully submitted,

<u>August 10, 2015</u>

/s/ Todd R. Walters

Todd R. Walters, Esq.
S. Lloyd Smith, Esq.
Roger H. Lee, Esq.
BUCHANAN INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, VA 22314
Telephone: (703) 836-6620
Facsimile: (703) 836-2021
Email: todd.walters@bipc.com

*Counsel for Appellee*
*Corning Optical Communications RF LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 10th day of August, 2015, the foregoing BRIEF

OF APPELLEE is being filed with the Clerk of the Court using the CM/ECF

System.


August 10, 2015                    /s/ Todd R. Walters
                                   Todd R. Walters, Esq.
                                   S. Lloyd Smith, Esq.
                                   Roger H. Lee, Esq.
                                   BUCHANAN INGERSOLL & ROONEY PC
                                   1737 King Street, Suite 500
                                   Alexandria, VA 22314
                                   Telephone:  (703) 836-6620
                                   Facsimile:  (703) 836-2021
                                   Email:  todd.walters@bipc.com

                                   *Counsel for Appellee*
                                   *Corning Optical Communications RF LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

 <u>X</u>  The brief contains <u>  12,934  </u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), or

___  The brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

 <u>X</u>  The brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2010</u> in a <u>14 pt. Times New Roman font</u>, or

___  The brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].


<u>August 10, 2015</u>                    <u>/s/ Todd R. Walters              </u>
                                        Todd R. Walters, Esq.
                                        *Counsel for APPELLEE*